UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80714-CIV-MARRA/JOHNSON

LUIS RODRIGUEZ,

Plaintiff,

vs.

ALPHA INSTITUTE OF SOUTH FLORIDA,
INC., d/b/a PALM BEACH ACADEMY OF
HEALTH & BEAUTY,

Defendant.
_____/

**OPINION AND ORDER**

      This cause is before the Court upon Defendant Alpha Institute of South Florida, Inc. d/b/a Palm Beach Academy of Health & Beauty's Motion for Summary Judgment (DE 24).  The motion is fully briefed and ripe for review.  The Court held oral argument on October 5, 2011.  The Court has carefully considered the motion and is otherwise fully advised in the premises.

      I.  Background

      The facts, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom in a light most favorable to the non-moving party, for the purpose of this motion, are as follows:

      Defendant Alpha Institute of South Florida, Inc. d/b/a Palm Beach Academy of Health & Beauty's ("Defendant" "Palm Beach Academy") is a career school in Lake Park, Florida.  It offers programs in cosmetology, massage therapy and skin care. (E. Creef. Dep. 23.)  David and Erin Creef have owned and operated it for ten years.  Ms. Creef is the Director and oversees the cosmetology and skin care programs. (E. Creef Decl. ¶ 2.)  Palm Beach Academy is approved by

the Florida Board of Cosmetology and accredited by the Accrediting Commission of Career Schools and Colleges of Technology. (E. Creef Dec. ¶ 3.)

The cosmetology program at Palm Beach Academy requires 1,200 course hours of study for graduation. Students begin in a classroom setting where they learn the study of hair and hairstyling. After approximately two months, the students move to the clinic floor where they work on live clients under the direct supervision of instructors. (E. Creef Dep. 25-27.) Prior to enrolling, all students receive a copy of the school catalog. The catalog sets the terms and conditions of enrollment, requirements for graduation and expectations regarding student conduct. It provides that abusive or disruptive behavior may be grounds for termination. Student misconduct is also discussed in the orientation packet provided to all students on their first day. The packet reiterates that verbally abusive behavior, or behavior deemed disruptive to class time, is grounds for termination. On their first day of class, new students execute an enrollment agreement. With respect to student conduct, the agreement reserves to the school the right to "warn, place on probation, suspend, or terminate a student. . . whose conduct or actions are a violation of the stated rules and regulations noted in the school catalog." (E. Creef Dec. ¶ 4.) Palm Beach Academy maintains a strict written policy against sexual harassment on school property. The policy is circulated to both students and instructors, and all students must acknowledge they received the policy and agree to abide by its terms. The policy establishes a reporting mechanism to anyone who feels they are a victim of harassment, whether by a student or school employee. (E. Creef. Dec. ¶ 5.)

The cosmetology field attracts people with different sexual orientations. (Rodriguez Dep. 236-37.) Over the ten years the school has been owned and operated by the Creefs, it has had

2

students who were openly gay, and gay or lesbian instructors on its faculty. (E. Creef Dec. ¶ 5; Gina Olson-Ferraro Dep. 60.)

Plaintiff Luis Rodriguez ("Plaintiff" "Rodriguez") is a 22-year old gay man. (Rodriguez Dep. 30.)  He enrolled in the cosmetology program at Palm Beach Academy in February of 2009. (Rodriguez Dep. 49.) On Plaintiff's first day, he executed the enrollment agreement and acknowledged he received the catalog and orientation packet and was responsible for following school policies.  He understood that violation of the conduct policy could lead to termination. (Rodriguez Dep. 52-54.)  Plaintiff also received the sexual harassment policy and was aware of the reporting mechanisms. (Rodriguez Dep. 54-55.)

Plaintiff testified that the harassment began in the classroom shortly after he started, and consisted of students asking him about his sex life and making negative comments about homosexuals. (Rodriguez Dep. 90-93.)  He claims students, mostly three female students in particular, said he was "twisted and confused," said ugly things to him, and made comments about anal sex. (Rodriguez Dep. 90-91, 100-01.)  Another student, named Avery, told him he was "gross," "disgusting" and "sin[ful]."  (Rodriguez Dep. 165.)  Plaintiff may have complained to an instructor during this period, or Kelly Barry, the Director of Cosmetology, but he is uncertain. (Rodriguez Dep. 94-98.)  This classroom period lasted about two months. (Rodriguez Dep. 62.)

Plaintiff complains that Instructor Margie treated him differently than the women with respect to the dress code, which included criticizing Plaintiff for wearing his longer hair down and not allowing him to have his nails painted.[1] (Rodriguez Dep. 103-06.)  Another instructor,

---

[1] Plaintiff also points out comments that were not said in his presence but that other students heard said about him. For example, Plaintiff states that he was told by other students that students said that he dressed like a "fairy." (Pl. Decl. ¶ 7.)  With respect to the comments heard

3

Bonnie Glover, made fun of him for wearing makeup.[2] (Rodriguez Dep. 109-10). A student named Emily once referred to Plaintiff as a "she-he." (Rodriguez Decl. ¶ 20.) At this time, Plaintiff did not want to do anything about the comments from students because he was "scared" and he knew teachers were not "doing anything to stop the bullying or comments." (Rodriguez Decl. ¶ 7.)

      On May 18, 2009, Sammy Rivera enrolled and began the cosmetology program. (E. Creef Decl. ¶ 6.) Since the program begins with two months of classroom work and Plaintiff was already on the clinic floor, they interacted only during breaks. (Rodriguez Dep. 138-39.) Plaintiff testified that although Sammy made rude comments to him about gays and anal sex, Plaintiff never complained to the school. (Rodriguez Dep. 139-40, 148.)

      After Sammy moved to the clinic floor, he continued to make crude references to Plaintiff, including calling him a "fag" and a "queen." (Rodriguez Dep. 160; see also Tierney Dep. 57.) Plaintiff stated that he looked for ways to avoid Sammy. (Rodriguez Dep. 148-49.)

      Former instructor Gina Olson-Ferraro, who is a lesbian, witnessed one incident when Sammy and Plaintiff were going back and forth and Sammy used the word "faggot." She immediately "shouted that down as quickly as I could" and told Sammy that such language was unacceptable. (Olson-Ferraro Dep. 13, 45-47.)

      At some point, Plaintiff told Ms. Creef that Sammy was harassing him because of his sexuality. (Rodriguez Dep. 154-59, 165-67.) Rodriguez states that he saw Ms. Creef pull Sammy

---

by another student, Marcie Tierney, she testified that she did not tell Plaintiff the comments other students made about him. (Tierney Dep. 55-56, 80.)

  [2] Plaintiff did not report this incident to the administration. (Rodriguez Dep. 110.)

into her office and assumed it was to talk to him about these issues because when they came out, he overheard her tell Sammy, "You don't have to like everyone. You just have to love everyone." (Rodriguez Dep. 157.)

On October 15, 2009, Plaintiff picked up Sammy's Louis Vuitton bag, put the straps over his shoulder, and said, "Sammy, doesn't this look cute on me?" Sammy shouted, "Don't fucking touch it. Get the fuck off my bag." (Rodriguez Dep. 177, 181.) Sammy started calling him names, and then threw a water bottle and pen at Plaintiff, neither of which hit him. (Rodriguez 178-81.) Rodriguez explained that he was "sort of teasing him because he makes fun of me for being gay but . . . he has a Louis Vuitton like a man bag." (Rodriguez Dep. 180.)  In response to this incident, Instructor Ruby yelled at both of them to stop it and Plaintiff gave Sammy the bag back and called him a junkie. (Rodriguez Dep. 177-79.)

Both Plaintiff and Sammy apologized to the instructor, and she allowed them to remain in class. (Alexandra McDonald Dep. 37-38; E. Creef Dep. 49-50.)  At the time, Plaintiff did not complain to the administration about this incident. (Rodriguez Dep. 183.)  Twelve days later, on October 27, 2009, Plaintiff complained to an instructor that the word "fag" was written in yellow on his student timecard. (Rodriguez Dep. 195-97.)  The timecard was then given to Instructor Peggy, who told him "Don't worry, Luis, we're going to deal with this." (Rodriguez Dep. 196.)

Ms. Creef met with Plaintiff later that day, with Instructor Peggy present.  Ms. Creef asked Plaintiff if he had any idea who wrote the word on his timecard and Plaintiff accused Sammy. (Rodriguez Dep. 197-98; E. Creef Dep. 45-47, 75.)  Ms. Creef told him they would deal with it and Plaintiff said "I'm not so sure about that" and that the harassment has been going on for months. (Rodriguez Dep. 198.)  Rodriguez referred to Sammy as a "fucking junkie"

5

and told Ms. Creef that, before getting clean through rehab, Sammy had done heroin as a young teenager. (Rodriguez Dep. 199-200.)  Ms. Creef then told Plaintiff that he needed to talk to Sammy and Plaintiff told her that he did not feel comfortable doing that. (Rodriguez Dep. 198.)

At that meeting, Rodriguez asked Ms. Creef if she would speak to his godfather, Adolfo Cruz. She agreed, and a meeting was held later that same evening. (E. Creef Dep. 53.)  The meeting was attended by the three of them and Instructor Will. At the meeting, Ms. Creef told Plaintiff she thought he had anger issues and that he should talk to Sammy about their issues. He responded, "I'm not doing that" and left. (Rodriguez Dep. 208, 212-13.)   This was the first time Ms. Creef had heard of the book bag incident. (E. Creef. Dep. 75.)  Ms. Creef met with Instructor Ruby the next day, who confirmed the book bag incident. (E. Creef Dep. 49-50; E. Creef Decl. ¶ 10.)

Ms. Creef then met with Sammy and told him to prepare a statement of the book bag incident. Sammy told her that he was very upset that Plaintiff had taken his book bag and called him a "junkie."  Sammy admitted he threw a water bottle and pen, and apologized to Ms. Creef. Sammy denied, however, writing "fag" on the timecard. Because Sammy admitted that he had thrown the water bottle at Plaintiff and also had called him a "fag" after school, Ms. Creef put Sammy on written probation. He was advised that any further incident would result in his termination. (E. Creef Dep. 50-52, 75; E. Creef. Decl. ¶ 11.)  Ms. Creef did not compare the writing on the timecard to any of Sammy's known writings. (E. Creef Dep. 51-52.)

Plaintiff did not attend school the day after the meeting with his godfather because he felt "unsafe."  He called Ms. Creef and they agreed to meet the next morning before he returned to class. (Rodriguez Dep. 206, 213-15; E. Creef Decl. ¶ 12.)

Ms. Creef met with Plaintiff on the morning of October 30. She intended to place him on probation - as she had with Sammy - for his conduct in class, for calling Sammy names, and for his conduct in their prior meeting. (E. Creef Dep. 61; E. Creef Decl. ¶ 13.) Ms. Creef stated that Plaintiff was yelling and unapproachable and she was fearful. At that point, she advised him that he was terminated from school and needed to leave the premises immediately. (E. Creef Dep. 62-63; E. Creef Decl. ¶ 13.) Plaintiff called Ms. Creef an "intolerant bigot." (Rodriguez Dep. 216.)

On November 13, 2009, the school sent Plaintiff a letter formally terminating his enrollment for violation of the conduct policy. He was advised he could petition the school to re-admit him, but never did. (Rodriguez Dep. 218-219; E. Creef Dep. 70-71.)

Defendant moves for summary judgment on the basis that (1) sexual orientation discrimination is not actionable under Title IX and (2) the harassment was not severe, pervasive or objectively offensive enough to have systematically deprived Plaintiff of access to the educational opportunities of the school and Defendant was not deliberately indifferent to the sexual harassment of which it had actual knowledge.

II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

III. Discussion

Plaintiff asserts that his Title IX claim rests on harassment[3] based on sexual stereotyping, and not harassment based on sexual orientation. While Title IX precludes discrimination "on the basis of sex" in the context of schools, sexual orientation is not protected under Title IX.[4] 20 U.S.C. § 1681(a); see Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc., 224 F.3d 701, 704 (7th Cir. 2000) (Title VII is not extended to permit claims of harassment based on an individual's sexual orientation); Mowery v. Escambia County Utilities Auth., No. 3:04CV382-RS-EMT, 2006 WL 327965, at * 8 (N.D. Fla. Feb. 10, 2006) ("Title VII permits no cause of action when the alleged harassment is based solely on one's sexual orientation or perceived sexual orientation"); Fitzpatrick v. Winn-Dixie Montgomery, Inc., 153 F. Supp. 2d 1303, 1306 (M.D. Ala. 2001) (sexual orientation is not a protected class under Title VII); cf. Fredette v. BVP Management Associates, 112 F.3d 1503, 1510 (11th Cir. 1997) ("We do not hold that discrimination because of sexual orientation is actionable" under Title VII while at the same time

---

[3] At oral argument, Plaintiff contended that the Complaint pled a claim for "implied retaliation" and illegal termination from the school. The Court dismisses this argument, finding that the only claim before the Court is one for harassment.

[4] Plaintiff cites several cases for the position that harassment based on perceived sexual orientation is actionable under Title IX because it was motivated by the plaintiff's sex. (Resp. at 9-10.) See, e.g., Schroeder ex rel Schroeder v. Maumee Board of Educ., 296 F. Supp. 2d 869, 880 (N.D. Ohio 2003) (the plaintiff asserted he was "repeatedly harassed based on his perceived sexual orientation"); Montgomery v. Independent School Dist. No. 709, 109 F. Supp. 2d 1081, 1090-91 (D. Minn. 2000) (the plaintiff "contends that the students engaged in the offensive conduct at issue not only because they believed him to be gay, but also because he did not meet their stereotyped expectations of masculinity"); Carrasco v. Lenox Hill Hosp., No. 99 CIV 927 (AGS), 2000 WL 520640, at * 8 (S.D.N.Y. 2000) (comments focused on the sexual conduct of the plaintiff as a man, when his co-workers knew he was married, may have been made "because of sex"). These cases are inapposite. Plaintiff is not bringing a case based on having been harassed because others perceived him to be homosexual and therefore not adequately masculine. Instead, he alleges he is a gay man who is discriminated against based on sexual stereotyping.

not holding that sexual orientation discrimination is not actionable).[5]

A review of the record shows that the vast majority of the comments made to Plaintiff pertained to his sexual orientation, and therefore cannot form the basis of his Title IX claim. (Rodriguez Dep. 90-93, 100-01, 139-40, 160, 165.) See Hamm v. Weyauwega Milk Products, Inc., 332 F.3d 1058 (7th Cir. 2003) (finding the plaintiff had not shown he was discriminated because of sex because his complaints about his coworkers related either to their disapproval of his work performance or their perceptions of his sexual orientation, despite comments in the record that the plaintiff was told he had a "high-pitched voice" and was called "girl scout"). Moreover, many comments highlighted as indicative of harassment based on sexual stereotyping were not made to Plaintiff, and Plaintiff was therefore unaware of these comments. (Tierney Dep. 55-56, 80.) Those comments about which Plaintiff was unaware cannot serve to constitute a harassment claim. See Edwards v. Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995) (incidents relied upon at the summary judgment stage that were not known to the plaintiff until after her termination could not have contributed to her subjective view of a hostile environment). With respect to Plaintiff's testimony that he was criticized for his long hair and for wanting to wear nail polish and makeup, for dressing like a "fairy,"[6] and for being called a

---

[5] In formulating the general standards for Title IX harassment, courts look to Title VII law. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 651 (1999).

[6] Plaintiff's declaration states that, while he was enrolled at the school, he was given a "tip" that other students made comments that he dressed like a "fairy". (Pl. Decl. ¶ 7.) A plaintiff may support a harassment claim by the use of conduct obtained through hearsay as long as he was aware of the incident at the relevant time at which he alleges he experienced the harassment. See Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir.1999) (hostile work environment claimant may introduce evidence of offensive men's room graffiti she learned about through hearsay during her employ, even though she had never been inside the men's room); Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir.1997) (allowing use of eight hearsay

"she-he," the Court finds that these comments simply do not rise to the level of harassment that was "so severe, pervasive, and objectively offensive" that it "systematically deprived [Plaintiff] of access to educational opportunities of the school." Hawkins v. Sarasota County Sch. Bd., 322 F.3d 1279, 1285 (11th Cir. 2003); see Levarge v. Preston Bd. of Educ., 552 F. Supp. 2d 248, 255 (D. Conn. 2008) (the student-plaintiff experienced "homophobic teasing" and having food thrown at him and the court found that no reasonable jury could find that the other students' conduct was severe, pervasive and objectively offensive).

The Court will now draw its attention to whether Defendant acted with "deliberate indifference" to "known" acts of harassment. Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 646-47 (1999) ("recipients of federal funding may be liable for subjecting their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority") (internal quotation marks omitted); Hawkins, 322 F.3d at 1283 quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 277 (a school district cannot be liable for sexual harassment of a student by one of the district's teachers 'unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to the teacher's misconduct.'")

Schools may be liable under Title IX only when there has been "actual notice" as well as "an official decision by the [school] not to remedy the violation." Hawkins, 322 F.3d at 1284. In

---

incidents of racially offensive remarks made outside the plaintiff's presence to be considered in hostile work environment claim, because "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment").

setting forth the appropriate standard for liability under Title IX, the United States Supreme Court borrowed the "deliberate indifference" approach employed in section 1983 jurisprudence. Id. Schools are "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648; see Doe v. School Bd. of Broward County, Fla., 604 F.3d 1248, 1259 (11th Cir. 2010) (same standard in teacher-on-student harassment). "This is not a mere reasonableness standard" . . . and "there is no reason why courts on a . . . motion for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law." Davis, 526 U.S. at 649. Examples of deliberate indifference include "no effort whatsoever either to investigate or to put an end to the harassment" as well as a "fail[ure] to respond," a lack of instruction to school personnel on how to respond to peer sexual harassment and a lack of a policy on the issue. Davis, 526 U.S. at 654; Hawkins, 322 F.3d at 1284. "In essence, Title IX's premise 'is an official decision by the recipient not to remedy the violation.'" Doe, 604 F.3d at 1259 quoting Gebser, 524 U.S. at 290. [7]

With respect to a policy, Defendant maintains a policy against sexual harassment which is provided to all students upon enrollment. Included in this policy is a mechanism to report the

---

[7] The parties do not brief the issue of "actual notice." Actual notice requires the plaintiff to identify an "appropriate person" . . . "with authority to take corrective measures in response to actual notice of harassment" and "the substance of that actual notice must be sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment." Doe, 604 F.3d at 1254. For purposes of summary judgment, the Court finds that Ms. Creef, the director and co-owner of the school, is the "appropriate person" under Title IX to take corrective measures. With respect to the comments made by Instructor Margie and Bonnie Glover to Plaintiff, however, there is no record evidence supporting a finding that Ms. Creef was aware of the comments made by these instructors to Plaintiff or that these instructors had a history of making harassing comments in the past to other students. Thus, there was no notice to Ms. Creef about the actions of these instructors.

harassment. (E. Creef. Dec. ¶ 5.)  Furthermore, Defendant promptly investigated Plaintiff's claims of harassment.[8]  For example, when Instructor Gina Olson-Ferraro heard Sammy use the term "faggot" she immediately reprimanded him.  Instructor Ruby demanded an apology from both Sammy and Plaintiff after the bookbag incident. When Instructor Peggy learned someone wrote "fag" on Plaintiff's timecard, she told him it would be taken care of and immediately informed Ms. Creef. At that point, Ms. Creef met with Plaintiff later that day with Instructor Peggy present.  That evening, Ms. Creef held another meeting with Plaintiff, Plaintiff's godfather and Instructor Will wherein she learned about the bookbag incident.  The very next day, Ms. Creef met with Instructor Ruby, who confirmed the book bag incident. Ms. Creef then met with Sammy, placed him on probation and warned him that further incidents would result in termination.

Once notified, a school's investigation, followed up by reasonable conclusions and actions designed to remedy the situation, cannot be found to be deliberate indifference. See Sauls v. Pierce County School Dist., 399 F.3d 1279, 1285 (11th Cir. 2005) citing Davis v. DeKalb County School Dist., 233 F.3d 1367, 1373-75 (11th Cir. 2000).  Plaintiff contends that Defendant's actions were unreasonable because (1) the harassment by Sammy did not stop after after instructors intervened; (2) Ms. Creef only spoke to Sammy and put him on probation and (3) Ms. Creef delayed her investigation into the timecard incident by a few hours, failed to conduct a handwriting analysis of the timecard, and waited until the next day to speak with Instructor Ruby about the bookbag incident between Sammy and Plaintiff. (Resp. at 16-17.)  The

---

[8] These complaints of harassment surround comments related to Plaintiff's sexual orientation only.  Although these comments are not actionable, for the purpose of a complete record, the Court will still apply the deliberate indifference standard to these facts.

Court disagrees.

First, it is immaterial that Defendant's interventions to stop the harassment were ineffective.  See Sauls v. Pierce County School District, 399 F.3d 1279, 1285 (11th Cir. 2005) ("the relevant inquiry is not whether the measures taken were effective in stopping discrimination, but whether the school district's actions amounted to deliberate indifference"). Next, with respect to Ms. Creef's actions, her response of initially speaking to Sammy, then eventually placing him on probation, was designed to remedy the situation and can hardly be seen as deliberate indifference.  Id.  Likewise, the delay of several hours into the timecard incident can hardly be viewed as deliberately indifferent, especially when Plaintiff waited twelve days to report the incident.  Lastly, Ms. Creef, as a director of a beauty school, was not in a position to conduct a handwriting analysis.  Instead, by confronting Sammy about the issue, Ms. Creef adequately addressed it.  Hence, for the foregoing reasons, the Court finds, as a matter of law, that Defendant was not deliberately indifferent to known harassment.

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (DE 24) is **GRANTED**. The Court will separately issue judgment on behalf of Defendant.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 27th day of October, 2011.

_____
KENNETH A. MARRA
United States District Judge